UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

HOWARD BRACKSON CARRIER,      )
                              )
        Petitioner,           )
                              )
v.                            )        No.:   3:21-CV-41-TAV-DCP
                              )
KEVIN GENOVESE,               )
                              )
        Respondent.           )
                              )

## MEMORANDUM OPINION

After Petitioner broke into the apartment residence of his estranged wife ("Brenda"), killed Jeffrey Washburn ("Washburn"), and repeatedly stabbed Brenda, a jury convicted Petitioner of first-degree murder, felony murder, attempted first-degree murder, and aggravated burglary. *State v. Carrier*, No. E2013-0247-CCA-R3-CD, 2014 WL 1645389, at *1–2 (Tenn. Crim. App. April 23, 2014), *perm. app. denied* (Tenn. Oct. 20, 2014) ("*Carrier I*"). Petitioner has never denied that he killed Washburn and attacked Brenda but insists that he did not have the premeditation required to support his convictions [Doc. 7, p. 23]. In his petition for habeas corpus relief under 28 U.S.C. § 2254 that is now before the Court, Petitioner seeks relief based on his claims that (1) false evidence from a witness warranted a new trial; (2) his trial counsel was ineffective for not obtaining a mental health evaluation to determine his mental state at the time of the offenses; (3) his trial counsel was ineffective for not challenging the felony murder charge by asserting that aggravated burglary did not support that charge under Tennessee law; and (4) his trial

counsel was ineffective for not challenging the sufficiency of the evidence to support his convictions [Docs. 1, 7].

Respondent filed a response in opposition to Petitioner's petition for § 2254 relief [Doc. 9] and the state court record [Doc. 8]. Petitioner filed a reply [Doc. 11].

After reviewing the relevant filings and the state court record, the Court finds that Petitioner is not entitled to habeas corpus relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## I.     BACKGROUND

In November of 2008, while Petitioner and Brenda were estranged, Brenda told Petitioner that she was "talking to" and/or seeing someone [Doc. 8-3, p. 93, 155–56]. Brenda did not tell Petitioner the name of the person with whom she was having a relationship, or that the relationship was sexual [*Id.* at 155–56]. But Petitioner told his and Brenda's son, Cordell Carrier ("Cordell"), "that if he caught [Brenda] with another man[,] he would kill them" [Doc. 8-4, p. 64–65, 67].

On November 25, 2008, Petitioner went to Brenda's apartment and knocked on the door but got no answer [Doc. 8-5, p. 31]. Petitioner broke into the apartment because he thought Brenda had another man in the apartment with her [*Id.*]. Petitioner found Brenda alone and told her that he wanted to have sex with her one more time before their divorce [Doc. 8-4, p. 48; Doc. 8-5, p. 32]. While they were talking, Brenda's phone began ringing,

2

and Petitioner asked if it was the person she was seeing [*Id.* at 49]. During this incident, Petitioner also "put [Brenda] down on the bed," removed his clothing, and got on top of her [Doc. 8-4, p. 48]. But after Brenda repeatedly asked Petitioner not to have sex with her, he relented and left her apartment [*Id.* at 48–49]. On the day of this incident, Petitioner gave a signed statement to police in which he indicated that he had talked to Brenda that morning and learned that "she was to be with another man," which "upset [him] terribly bad" [Doc. 8-5, p. 29].

At some point prior to December 10, 2008, Cordell saw a large Buck knife next to the driver's seat in Petitioner's truck [*Id.* at 65–66; Doc. 14-1, p. 92]. This was the only time Cordell remembered seeing such a knife in Petitioner's truck [Doc. 8-4, p. 84]. When Cordell asked Petitioner about the Buck knife, Petitioner told him that it was there "in case [Petitioner] needed to kill someone" [*Id.* at 66].

On the evening of December 9, 2008, Brenda spoke to Petitioner and told him that she would be working that night [Doc. 8-3, p. 97]. Instead, however, Washburn picked Brenda up and took her to his house [*Id.*]. When she left her apartment, Brenda locked the door and left the front porch light on [*Id.*].

Petitioner testified that he spoke to Brenda at approximately 4:55 a.m. on December 10, 2008, at which time he was in the driveway of his home and Brenda told him she was at home [Doc. 14-1, p. 71–72]. Petitioner then went to a fast-food restaurant and got some breakfast, which he ate in his truck on his way to Brenda's apartment [*Id.* at 72–73]. When he arrived at Brenda's apartment, Petitioner knocked on the door,

but no one answered, and he kicked the door open [*Id.* at 73–74]. Petitioner walked through the apartment and used a cigarette lighter to look for someone but did not find anyone there [*Id.* at 74–75].

When Petitioner entered Brenda's apartment on December 10, he was carrying both a pocketknife and a large Buck knife [*Id.* at 76–77, 80–81, 85–86]. Petitioner did not use the Buck knife for hunting and carried it as a memento to his uncle [*Id.* at 85–86]. He carried the Buck knife in a sheath because it was so sharp [*Id.* at 90–91].

At around 5:30 a.m. on December 10, Washburn and Brenda returned to Brenda's apartment, at which point Brenda noticed that the front porch light was off and said "'I thought I left the porch light on,'" to which Washburn responded "'[y]ou did'" [Doc. 8-3, p. 99–101]. Brenda did not see Petitioner's truck parked near her apartment [*Id.* at 100–101]. Brenda and Washburn got out of Washburn's car and walked up the steps toward her apartment, with Washburn leading the way and holding the keys to the apartment [*Id.* at 101–03].

When Washburn went to put the key in the door of Brenda's apartment, he said "'the glass is broke [sic],'" at which point Brenda indicated that they should leave and call the police [*Id.* at 103]. But after Brenda and Washburn turned around and began to leave, Petitioner walked out of the apartment door [*Id.* at 106–07]. Petitioner said "'[a]re you the man that's f[*]cking my wife?'" [*Id.* at 107]. Petitioner testified that Washburn responded "[e]very chance he got" [Doc. 14-1, p. 94]. But Brenda expressly denied that Washburn

4

made such a statement and testified that Washburn actually replied "'[w]e don't need to be doing this. I've got to go to work" [Doc. 8-3, p. 107].

Without moving toward Petitioner, Washburn put his hands up and said "'[w]hat's that in your hand'" to Petitioner, at which point Brenda began screaming [*Id.* at 107–08]. Petitioner and Washburn started wrestling, and Petitioner stabbed Washburn in the back with a large knife while Brenda tried to call 911 [*Id.* at 108–09]. Brenda did not think any of her 911 calls connected [*Id.* at 72–73], but a recording of a 911 call introduced at trial contains Petitioner's voice saying "'Son-of-a-b[*]tch, he's dead'" [Doc. 8-5, p. 13].

Eventually, Brenda pulled the large knife out of Washburn's back and threw it off the porch [Doc. 8-3, p. 109]. Brenda indicated that they should help Washburn, but Petitioner said "'[t]he motherf[*]cker's dead," and told Brenda that he was going to kill her [*Id.* at 110]. Petitioner was not screaming or crying [*Id.*].

Petitioner then took Brenda into the apartment, closed the apartment door, stated that he was going to kill her, and began stabbing her with a pocketknife while she had her arms up and begged him not to do it and specifically asked him not to kill her for the sake of their children [*Id.* at 110–111]. Brenda thought she was going to die [*Id.*].

At some point, a neighbor entered the apartment and saw Petitioner standing over Brenda with a knife [*Id.* at 46]. Petitioner was not speaking, crying, screaming, or showing any emotions [*Id.*]. The neighbor told Petitioner to stop, and he did [*Id.* at 112]. The neighbor also told Petitioner to "'[g]et the f[*]ck out,'" at which point Petitioner stabbed himself [*Id.* at 46]. The neighbor then grabbed Brenda's hand and led her out of the

5

apartment and to the neighbor's apartment [*Id.* at 47]. While doing so, the neighbor turned around and saw Petitioner "calmly walking down the stairs" [*Id.*].

After the December 10 incident, police found broken glass and pieces of Brenda's apartment door swept up into a pile behind the door, with a broom laid across it [Doc. 8-4, p. 120-22; Doc. 8-7, p. 34]. However, Petitioner denied "do[ing] any housecleaning" while he was in Brenda's apartment [Doc 8-5, p. 17–18], and the glass pieces in the pile appear to have spots of blood beneath them [Doc. 8-7, p. 34], which Petitioner's counsel pointed out in his cross examination of a police detective [Doc. 8-4, p. 139–40].

Police also found Petitioner's pocketknife about 100 to 150 feet from Brenda's apartment door after the December 10 incident [*Id.* at 154; Doc. 8-5, p. 9]. The prosecution suggested that the spot where police found this pocketknife was where Petitioner had parked on the morning of December 10 [Doc. 8-6, p. 9, 13, 35–36]. But Petitioner stated that he had parked his truck directly in front of Brenda's car, in a place where she would have seen it when she came home [Doc. 8-5, p. 6; Doc. 14-1, p. 73].

At his trial, Petitioner also claimed that he "blacked out" and did not remember stabbing Washington or Brenda, or how long the fight lasted, and that he did not come out of this "blackout" until the neighbor entered the apartment [Doc. 14-1, p. 95–96]. But Petitioner went to the hospital on December 10, 2008 [Doc. 8-5, p. 14], where a nurse asked Petitioner if he had meant to kill his wife [*Id.* at 59]. Petitioner responded "'I must have. I stabbed her four or five times'" [*Id.*]. Petitioner also told an officer that he had "taken care of his problem earlier that day" and had "stuck" an unspecified male, who "was

6

bleeding like a stuck pig" [*Id.* at 63]. Additionally, Petitioner told the same officer that he had told his wife to wait until they were no longer married, and that no one should sleep with another man's wife [*Id.*].

Police did not search the kitchen drawers or pieces of furniture in processing Brenda's apartment after the incident [Doc. 8-4, p. 122–23]. And when Brenda and her sister returned to that apartment in the weeks following the December 10 incident, Brenda's sister found a Buck knife sheath in a kitchen drawer and a knife sharpener in an ottoman [*Id.* at 91–95]. At Petitioner's trial, Cordell testified that Petitioner owned both the knife sheath and the knife sharpener [*Id.* at 71]. Petitioner denied ever having seen the knife sharpener before [Doc. 14-1, p. 83–84, Doc. 8-5, p. 19–20] but admitted that the knife sheath was the one he used for his Buck knife [Doc. 14-1, p. 90–91]. Petitioner had no explanation for the presence of his Buck knife sheath in the kitchen drawer of Brenda's apartment [Doc. 8-5, p. 12].

In cross-examining Petitioner, the prosecution emphasized that Petitioner claimed that he did not own the knife sharpener despite Cordell testifying that he did [Doc. 8-5, p. 19–20]. Also, in its closing statement, the prosecution relied on Cordell's testimony that the knife sharpener belonged to Petitioner as evidence of premeditation and to impeach Petitioner, specifically asserting that Petitioner had come to Brenda's apartment "armed with two knives and a sharpener," and that Petitioner's denial of ownership of the knife sharpener meant that he could not "face the truth of what he did" [Doc. 8-6, p. 11, 15, 44].

7

The jury convicted Petitioner of premeditated first-degree murder, first-degree murder in the perpetration of aggravated burglary, attempt to commit first-degree murder, and aggravated burglary [Doc. 8-6, p. 53–55]. The trial court merged the convictions for first-degree murder and first-degree murder in the perpetration of aggravated burglary and sentenced him to life imprisonment for those convictions [*Id.* at 59]. The trial court sentenced Petitioner to fifteen years' imprisonment for his attempted first-degree murder conviction and three years for aggravated burglary, to be served concurrently with each other and the life imprisonment sentence [Doc. 8-8, p. 20].

After Petitioner's trial, his counsel determined that the knife sharpener Brenda's sister found in Brenda's apartment in the weeks after the incident on December 10 did not belong to Petitioner but instead belonged to the owner of the furnished apartment, and the state stipulated to this [Doc. 8-10, p. 8–12; Doc. 8-11, p. 3–5]. Accordingly, Petitioner filed a motion for new trial based on Cordell's false testimony about the knife sharpener, as well as other grounds [Doc. 8-1, p. 23–24, 28–38]. In this motion, Petitioner asserted that Cordell's testimony violated his constitutional right to a fair trial but did not allege that the prosecution knew that Cordell's testimony regarding Petitioner's ownership of the knife was false at the time of the trial [Doc. 8-1, p. 28–38, 97–108]. Rather, in his memorandum in support of this motion, Petitioner specifically argued that "[u]nder Tennessee law, an allegation of perjury without the knowledge of the prosecutor falls under the general rules of newly discovered evidence" [*Id.* at 104]. Also, at the hearings regarding this motion, Petitioner's counsel acknowledged that he had no proof that Cordell's testimony that

8

Petitioner owned the knife sharpener was intentional perjury, or that the state knew that the testimony was false prior to Cordell giving the testimony [Doc. 8-10, p. 18–19; Doc. 8-11, p. 13, 29]. The trial court denied Petitioner's motion for a new trial [Doc. 8-11, p. 21], the Tennessee Court of Criminal Appeals ("TCCA") affirmed Petitioner's convictions, and the Tennessee Supreme Court ("TSC") denied review. *Carrier I.*

Petitioner then filed a petition for post-conviction relief alleging, among other things, that his trial counsel was ineffective for not seeking funds for an expert to testify about his state of mind at the time of the crimes [Doc. 8-17, p. 10–14, 63]. The TCCA affirmed the post-conviction court's denial of the petition. *Carrier v. State*, No. E2019-01004-CCA-R3-PC, 2020 WL 2931903, at *6 (Tenn. Crim. App. June 3, 2020) ("*Carrier II*").

Petitioner then filed the instant petition for relief under § 2254 [Doc. 1].

## II.    STANDARD OF REVIEW

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

9

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold" (citing *Williams*, 529 U.S. at 410)). Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted his available state remedies for the claim. 28 U.S.C. §2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Court v.*

10

*Lydon*, 466 U.S. 294, 302–03 (1984)).  Fair presentation means that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971).  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted).  Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state and the federal courts.  *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process).  Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court.  Tenn. S. Ct. R. 39.

If a prisoner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991).  In such circumstances, the claim is technically exhausted but procedurally defaulted.  *Gray v. Netherland*, 518 U.S. 2074, 2080 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted").  Tennessee petitioners may generally proceed only through one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions.  Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

11

A federal district court may review a procedurally defaulted habeas corpus claim only where the petitioner shows cause for his default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. Errors of post-conviction counsel cannot generally serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 753–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012). The Supreme Court has described the *Martinez* exception as follows:

> [The exception] allow[s] a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–14, 16–17). This exception, commonly referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

An ineffective assistance of counsel claim is substantial where it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). Conversely, "a claim is insubstantial when 'it does not have any merit,' 'is wholly without factual support,' or when 'the attorney in the initial-review collateral proceeding did not perform below constitutional

12

standards.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16).

## III.   ANALYSIS

### A.   Knife Sharpener Evidence

Petitioner first claims that the prosecution's reliance on Cordell's false testimony that the knife sharpener found in Brenda's apartment in the weeks after the crimes belonged to Petitioner as evidence of Petitioner's premeditation and to impeach his credibility entitled him to a new trial under the *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972) line of cases, and that the TCCA's denial of this claim was contrary to and an unreasonable application of clearly established federal law due to its failure to evaluate this claim under these cases [Doc. 1, p. 5–6; Doc. 5, p. 13–26]. While Petitioner acknowledges the lack of any evidence that the prosecution intentionally presented this false evidence, he denies that he or his counsel ever conceded that the prosecution's presentation this evidence was unintentional and suggests that the witnesses themselves may have intentionally presented this false evidence [Doc. 5, p. 19–20].

In his response, Respondent asserts that Petitioner procedurally defaulted this claim, specifically claiming that while Petitioner generally cited his constitutional right to a fair trial and due process in presenting this claim to the TCCA, he did not "further support these bare citations with any additional federal legal argument" [Doc. 9, p. 11–13]. Respondent further contends that, even if Petitioner had properly exhausted this claim, he would not be entitled to § 2254 relief because this false evidence did not infect the trial in a manner that

violated Petitioner's right to due process in light of the other overwhelming evidence of Petitioner's guilt, and because Petitioner acknowledges that the prosecution did not know about this false testimony until after the trial [*Id.* at 13–15].

In his reply, Petitioner acknowledges that his TCCA brief did not cite federal cases but asserts that as his brief referred to a denial of his constitutional rights "and alleged facts well within the mainstream of constitutional law," he sufficiently presented this federal claim to the TCCA [Doc. 11, p. 5–16]. Petitioner also claims that neither he nor his counsel conceded that the prosecution did not intentionally or knowingly present false testimony [*Id.* at 15].

It does not appear to the Court that Petitioner fairly presented the *Napue*/*Giglio* claim he seeks to present in his § 2254 filings to the TCCA. But the Court declines to rule on this issue, as even if Petitioner had exhausted this claim with the TCCA, he still would not be entitled to relief for this claim under § 2254. Specifically, the Sixth Circuit has held that a false testimony claim under the *Napue*/*Giglio* line of cases requires Petitioner to show "(1) that the prosecution presented false testimony; (2) that the prosecution knew [the testimony] was false; and (3) that [the false testimony] was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005) (citing *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992)). Under this standard, false testimony is material, and "[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154 (alterations and internal quotation marks omitted) (quoting *Napue* 360 U.S. at 271).

14

Petitioner has not pointed to any evidence in the record that the prosecution knew or should have known that Cordell's testimony about the knife sharpener was false at the time of trial, nor is the Court aware of any. Additionally, Petitioner would not be entitled to § 2254 relief for this claim because the Court finds no reasonable likelihood that the false testimony about the knife sharpener affected the jury's judgment due to the overwhelming other evidence of Petitioner's premeditation of his crimes. Such evidence includes but is not limited to (1) Petitioner's statement to Cordell that if he found Brenda with another man, he would kill them; (2) Petitioner's statement to Cordell that he was carrying the large Buck knife in his truck in case he needed to kill someone; (2) Petitioner's act of parking his car where it was not visible to Brenda when she arrived back at her apartment on the morning of December 10; (3) Petitioner's use of a cigarette lighter to see inside Brenda's apartment rather than turning on lights on the morning of December 10; (4) the discovery of the Buck knife sheath in Brenda's apartment kitchen drawer after the crimes; and (5) Petitioner's words and demeanor immediately prior to, during, and after him killing Washburn, and attempting to kill Brenda, including his hospital statements on December 10.

Accordingly, Petitioner is not entitled to § 2254 relief for this claim.

## B.    Ineffective Assistance of Counsel Claims

In his § 2254 petition, Petitioner asserts that his trial counsel was ineffective for:

(1)    Failing to retain an expert to testify regarding his mental state;

(2)    Not challenging the felony murder charge by asserting that aggravated burglary did not support this charge under Tennessee law; and

15

(3)    Not challenging the sufficiency of the evidence to support his convictions.

The Court will address each of these claims in turn, after setting forth the applicable standard of review.

### 1.    Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  This includes the right to "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  A petitioner has the burden of proving ineffective assistance of his counsel.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  A party asserting an ineffective-assistance-of-counsel claim must

16

"identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim must be rejected. *Strickland*, 466 U.S. at 69. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 2. Mental Health Evaluation

Petitioner claims that he is entitled to relief under § 2254 because his counsel was ineffective for not retaining a mental health expert to testify that Petitioner's "sudden rage" at the time of the relevant events "lessen[ed] Petitioner's culpable mental state," and that a state rule prevented Petitioner from obtaining funds for an expert to present proof of this claim in his post-conviction proceedings [Doc. 1, p. 7–8]. Also, in his memorandum,

17

Petitioner asserts that his counsel should have obtained an independent mental evaluation to "support the defense theory in favor of killing in the heat of passion with sufficient provocation" and "establish[] that the killing was manslaughter and not premeditated first degree murder" [Doc. 5, p. 27].

Respondent asserts that Petitioner procedurally defaulted this claim because, in his post-conviction appellate brief, Petitioner only asserted that his trial counsel should have obtained an expert to testify regarding his "diminished capacity" at the time of the offenses, rather than to support a defense of adequate provocation [Doc. 9, p. 17–18]. Respondent further asserts that this claim has no merit, as there is no reasonable probability that the jury would have reached a different result if a mental health expert had testified about Petitioner's mental state at the time of the crimes due to Petitioner's statements about the stabbings at the hospital [*Id.* at 18–19]. Respondent also claims that Petitioner is not entitled to § 2254 relief for his assertion that a state rule prevented him from obtaining an expert to support this claim in his post-conviction proceedings because the applicable rule did not prevent Petitioner from retaining such an expert but instead only precluded the post-conviction court from providing funds for the expert and Petitioner was not entitled to due process in his post-conviction proceeding [*Id.* at 19–20]. In a footnote, Respondent also asserts that Petitioner's trial counsel's testimony that he did not hear enough evidence to warrant seeking funds for an expert establishes that counsel made a strategic decision not to consult a mental health expert [*Id.* at 19, n.4].

18

In his reply, Petitioner denies that he procedurally defaulted this claim and asserts that a mental health expert could have testified that he "did, or could have, suffered a temporary lapse in reason driven by a sudden rage in the heat of passion which caused [him] to 'blackout;' yet come to his senses shortly thereafter and witness the carnage he had done and be so overcome with guilt that he attempt[ed] to take his own life" [Doc. 11, p. 17–19]. Petitioner also asserts that he was entitled to due process in his post-conviction proceeding and disputes Respondent's categorization of his trial counsel's decision not to hire a mental health expert as "strategic" [*Id.* at 19–21].

The Court finds that Petitioner has not met his burden to establish that his trial counsel was deficient for not obtaining a mental health expert to testify at trial regarding his mental health state, or a reasonable probability that the lack of such testimony caused him prejudice. Accordingly, the Court will deny this claim on these grounds, and it will not reach the issue of whether Petitioner properly exhausted this claim with the TCCA.

Under Tennessee law, expert testimony regarding a defendant's mental state is only admissible where it establishes "that the defendant lacks the capacity, because of a mental disease or defect, to form the requisite culpable mental state to commit the offense." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997); *see also State v. Ferrell*, 277 S.W.3d 372, 378–79 (Tenn. 2009) (citing *Hall*, 958 S.W. 2d at 689), *State v. Faulkner*, 154 S.W.3d 48, 56–57 (Tenn. 2005) (citing *Hall*, 958 S.W.2d at 690). Moreover, the Tennessee Supreme Court emphasized in *Hall* that expert evidence regarding a defendant's mental state "should not be offered as proof of 'diminished capacity'" or "a particular emotional state or mental

19

condition" but only "to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id.* at 690. Notably, approximately eight months before Petitioner's trial, the Tennessee Supreme Court relied on its holding in *Hall* to find that a trial court did not err in declining to give a jury instruction for diminished capacity where the defendant argued that the evidence showed that fear caused him to commit the underlying offense. *State v. Hatcher*, 310 S.W.3d 788, 806–07 (Tenn. 2010) (citing *Hall*, 958 S.W.2d at 690).

The testimony at the hearing on Petitioner's post-conviction hearing establishes that Petitioner's counsel was not deficient for not seeking funds to consult with a mental health expert and based that strategic decision on his investigation of the relevant law and facts. And Petitioner has not set forth any evidence from which the Court can determine that, if Petitioner's trial counsel had sought funds for such an expert, that expert's testimony would have been admissible at trial under Tennessee law, such that there is a reasonable probability that this it could have affected the jury's verdict.

Specifically, at Petitioner's post-conviction hearing, Petitioner testified in relevant part that he repeatedly asked his trial counsel "when and if they were going to do a mental evaluation on me" to determine his "state of mind" at the time of the incident underlying his charges [Doc. 8-18, p. 17–18]. Petitioner also stated that his trial counsel told him "that it was a crime of passion . . . ." rather than first-degree murder [*Id.* at 19]. Petitioner further asserted that he had tried to take his life at the crime scene and talked to his trial counsel

about a mental evaluation on "[s]everal occasions," but trial counsel did not seek that evaluation [*Id.* at 32].

Petitioner's trial counsel testified that he had been practicing law in Tennessee for forty-two years, had served as a public defender for twenty-nine years, and had handled at least twenty murder cases in that time [*Id.* at 46–47]. Petitioner's trial counsel further testified that Petitioner did not have any difficulty remembering the events underlying the charges against him, and Petitioner's trial counsel did not recall Petitioner telling trial counsel that he had blacked out during those events [*Id.* at 54]. According to Petitioner's counsel, Petitioner's attitude about the incident "was that he was very upset over his wife having a boyfriend, and that he was very uncertain about it. But when he—before he became more certain, he acted on his—on what he felt and killed the man" and felt justified in doing so [*Id.* at 54–55]. Petitioner's counsel acknowledged that while he and Petitioner agreed that "the defense would be that he was in a state of passion, and seek the jury to come back with a lesser verdict," "[t]hat wasn't a real good defense, but . . . there wasn't a whole lot . . . . And it was . . . pretty obvious what [Petitioner] was doing" [*Id.* at 55–56].

Petitioner's trial counsel additionally testified he routinely sought mental health evaluations for his clients where it was relevant to the case but did not do so where "the facts don't warrant that" [*Id.* at 56–57]. And Petitioner's trial counsel did not see any need for or benefit to requesting funds for a mental health expert for Petitioner [*Id.* at 57–58, 67]. Specifically, Petitioner's trial counsel "[did not] think [Petitioner] was mentally ill" but instead "[thought Petitioner] was just mad at what was going on with his wife"

21

[*Id.* at 58]. When Petitioner's post-conviction counsel specifically asked trial counsel whether he "kn[e]w whether an expert or not an expert could have come in and testified that . . . to a reasonable degree of medical certainty . . . they believed [Petitioner] had diminished mental capacity or diminished mental state," Petitioner's trial counsel responded that he was "not aware of any evidence in [Petitioner's] history that would make us look into that" [*Id.* at 69–70]. Petitioner's trial counsel further stated that, in determining whether to seek a mental health expert, he would talk to his client and the people who knew his client and check whether the client had been evaluated in a mental hospital, among other things [*Id.* at 70]. Petitioner's trial counsel also again acknowledged that he and Petitioner "probably discussed" his opinion that "[t]his was a crime of passion" but noted that "a crime of passion doesn't make it manslaughter" [*Id.* at 76].

Accordingly, the proof in the record demonstrates that Petitioner did not tell his counsel that he blacked out when he stabbed Washburn and Brenda, and, to the contrary, Petitioner's counsel was aware that Petitioner remembered the December 10 events. Petitioner's counsel was also aware that Petitioner felt that he was justified in stabbing Washburn and Brenda. Nevertheless, Petitioner asserts that, because he repeatedly asked his counsel about a mental health examination and injured himself after stabbing Brenda and Washburn, his counsel should have requested funds for a mental health expert to testify about his emotional state of mind at the time of the crimes.

Petitioner has not presented any evidence that his trial counsel had reason to know of any facts that would have warranted trial counsel seeking funds for such an expert.

22

Nothing in the record suggests that Petitioner had a mental disease or defect that negated his ability to premeditate his crimes, as Tennessee law requires for such expert testimony to be admissible. *Hall*, 958 S.W.2d at 690. Instead, it is apparent from the record as a whole that Petitioner's counsel determined that seeking a mental health expert would not be an effective strategy in Petitioner's case based on his knowledge and investigation of the facts and law in Petitioner's case.

Thus, Petitioner has not demonstrated that his counsel's decision not to seek funds for a mental health evaluation was deficient performance. *Strickland*, 466 U.S. at 690–91 (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Petitioner likewise has not established that testimony from any such expert would have been admissible under Tennessee law, *Hall*, 958 S.W.2d at 690, such that the lack of such testimony could have prejudiced him.

The Court therefore finds that Petitioner has not established either prong of *Strickland* for this ineffective assistance of counsel claim, which renders Petitioner's argument regarding the post-conviction court's denial of funds for an expert based on a state rule moot, and the Court therefore will not address it.[1] Petitioner is not entitled to § 2254 relief for this claim.

---

[1] The Court does note, however, Petitioner's post-conviction counsel filed a motion seeking a continuance because Petitioner "now ha[d] the opportunity and means" to get the mental evaluation for which he had previously requested funding from the post-conviction court [Doc. 8-17, p. 81–82]. Thus, the record seems to contradict Petitioner's assertion that a state rule prevented him from obtaining the requested mental health evaluation.

23

### 3. Aggravated Burglary Charge

Petitioner next relies on *Martinez* to assert that his trial counsel was ineffective for not objecting to the felony murder charge against him by asserting that aggravated burglary is not an offense that supports a felony murder charge under Tenn. Code Ann. § 39-13-202(a)(2) [Doc. 1, p. 8–9; Doc. 5, p. 35–40]. Specifically, Petitioner asserts that because this statute states, in relevant part, that "First Degree Murder is . . . a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, . . . burglary, . . . aggravated child abuse, aggravated child neglect, . . . [or] aggravated rape of a child" and does not specifically list "aggravated burglary" as an offense that supports such a charge, "a fair reading" of this statute indicates that the Tennessee General Assembly did not intend for aggravated burglary to be an offense that supports a felony murder charge, especially as the statute specifically includes aggravated child abuse, aggravated child neglect, and aggravated rape of a child as offenses that support a felony murder charge [Doc. 5, p. 35–36]. To support this argument, Petitioner cites a case in which the TSC determined that facilitation of controlled substances within one-thousand feet of a school did not violate the Drug Free School Zone Act because the relevant statute did not specifically list facilitation as an offense that violates that Act [*Id.* at 36–39]. Petitioner asserts that this same logic should apply to his felony murder conviction based upon aggravated burglary, that his counsel was ineffective for not making this argument, and that this deficiency prejudiced him [*Id.* at 39–40].

24

However, Respondent points out in his reply that the TCCA has rejected the argument that aggravated burglary is not an offense that supports a felony murder conviction under Tennessee law by finding that aggravated burglary is a type of burglary and therefore is an offense that underlies a felony murder conviction under the felony murder statute [Doc. 9, p. 21–22]. Respondent also asserts that this Court may not second guess this state court determination regarding state law [*Id.*].

In his reply, Petitioner (1) seeks to distinguish a Tennessee case on which Respondent relies for this argument; (2) asserts that the main case on which Respondent relies does not include legal analysis of its conclusion that an aggravated burglary supports a felony murder conviction, and the Court should therefore grant him relief; and (3) reiterates his arguments in support of this claim from his memorandum [Doc. 11, p. 21–28].

Petitioner is not entitled to relief under § 2254 for this claim. As Respondent correctly points out, the TCCA has specifically rejected the "argument that the felony murder statute does not include 'aggravated burglary' as an underlying felony since it only lists 'burglary'" based on its finding that "[a]ggravated burglary is a type of burglary and supports a felony murder conviction." *Adams v. State*, No. W1998-00531-CCA-R3-CD, 1999 WL 1565193, at *5 (Tenn. Crim. App. Dec. 21, 1999) (citing *State v. Langford*, 994 S.W.2d 126 (Tenn. 1999)). While Petitioner asserts that the *Adams* holding on this issue does not contain legal analysis, the Court finds that it is an accurate legal

25

interpretation of the unambiguous language of the Tennessee felony murder statute, which provides in relevant part that "a killing of another committed in the perpetration of or attempt to perpetrate **any**. . . burglary" is first-degree murder. Tenn. Code Ann. § 39-13-202(a)(2) (emphasis added).

In light of the TCCA's holding in *Adams*, Petitioner has failed to show that his counsel was deficient in not making the argument that aggravated burglary does not support a felony murder conviction, or that he was prejudiced by counsel's failure to make such an argument. Specifically, Petitioner has not shown deficient performance because counsel does not have to make a meritless argument. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999). And Petitioner has not shown prejudice, as the *Adams* holding directly forecloses the argument Petitioner asserts that his counsel should have made, and the Court will not second guess state court determinations of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim under *Martinez*.

### 4. Sufficiency of the Evidence

Petitioner next relies on *Martinez* to assert that his trial counsel was ineffective for not raising a claim challenging the sufficiency of the evidence [Doc. 1, p. 10–11; Doc. 5, p. 40–54]. Respondent contends that this is actually a claim for ineffective assistance of appellate counsel that is not cognizable under *Martinez* [Doc. 9, p. 22–24]. In his reply,

26

Petitioner contends that, as any argument not raised in a motion for new trial is waived on appeal under Tennessee law, this is a cognizable *Martinez* claim for ineffective assistance of trial counsel [Doc. 11, p. 28–30]. As this claim has no merit even if it is cognizable herein, the Court will dismiss it on this ground.

The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979), provides the controlling rule for a claim challenging the sufficiency of the evidence to support convictions. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded by statute on other grounds, as recognized in Parker v. Matthews*, 567 U.S. 37 (2012). In *Jackson*, the Supreme Court held that the evidence is sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

The Court has reviewed the entire record in this case and finds that, viewing the evidence in the light most favorable to the prosecution, the evidence of Petitioner's guilt for all the crimes for which he was convicted was overwhelming, even without the false evidence regarding the knife sharpener from Cordell. As such, Petitioner has not shown that his counsel was deficient for not challenging the sufficiency of the evidence to support those convictions, or that there is any reasonable probability of prejudice to Petitioner from his counsel's failure to make such an argument. Thus, this argument has no merit, and Petitioner is not entitled to relief under § 2254 for this claim under *Martinez*.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right and thus a COA should issue. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right with regard to any of his claims, such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE**. Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

### AN APPROPRIATE JUDGMENT ORDER WILL ENTER.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

28